UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LILIAN GABRIELA ATENCIO SUAREZ,

Petitioner,

v.

MARKWAYNE MULLIN, *et al*.,

Respondents.

Case No. C26-2916-SKV

ORDER GRANTING IN PART PETITION FOR WRIT OF HABEAS CORPUS

Petitioner is currently detained by U.S. Immigration and Customs Enforcement ("ICE") at the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington. She filed, through counsel, this 28 U.S.C. § 2241 habeas action, challenging her July 28, 2026, arrest and redetention, without first receiving notice or an opportunity to be heard, as violative of the Administrative Procedure Act ("APA") and her Fifth Amendment right to Due Process.[1] Dkt. 1, ¶¶ 1, 38, 121-57. She seeks release from custody and forward-looking relief related to any future redetention. *Id.* at 38-40. Respondents filed a return (Dkt. 5), together with a declaration from

[1] The Court observes that the petition references and cites a purported declaration in support from Petitioner, identified as "Exhibit D" throughout the petition, but that declaration does not appear to have been included or filed into the record.

U.S. Department of Homeland Security ("DHS") Deportation Officer Kurtis Reed (Dkt. 6) ("Reed Decl."). Petitioner filed a traverse in reply. Dkt. 7.

Having considered the parties' submissions and the governing law, the Court GRANTS in part the petition (Dkt. 1) for the reasons set forth below.

## I. BACKGROUND

Petitioner is a native and citizen of Venezuela who sought entry into the United States through the Venezuelan Humanitarian Parole program. Dkt. 1, ¶ 3; Reed Decl., ¶¶ 3-4. Prior to her entry, Petitioner filed an application with U.S. Citizenship and Immigration Services ("USCIS") for her uncle to sponsor her upon her arrival to the United States. Dkt. 1, ¶¶ 3-4. USCIS approved her sponsor's Form I-134 "Declaration of Financial Support" on November 1, 2022, and ultimately authorized Petitioner to travel to the United States. *See* Dkt. 1-6 at 2; Dkt. 1, ¶ 4; Dkt. 1-5 at 2-3.

On November 22, 2022, Petitioner arrived at a Port of Entry in Houston, Texas. Reed Decl., ¶ 4. Customs and Border Protection ("CBP") paroled Petitioner into the United States under the Venezuelan Humanitarian Parole program with an expiration date of November 20, 2024. *Id.*

On March 16, 2024, prior to her parole expiring, Petitioner applied for Temporary Protected Status ("TPS") with USCIS.[2] *Id.* ¶ 5. Her application was subsequently approved, which provided Petitioner with TPS status from December 20, 2024, to April 2, 2025. *Id.* ¶ 5; *see* Dkt. 1-11 at 2. On January 29, 2025, Petitioner applied for "TPS re-registration" with USCIS, which accepted her application and filing fee. Reed Decl., ¶ 6; *see* Dkt. 1-11 at 4

[2] "The benefits of TPS are temporary protection from removal (or deportation), employment authorization in the United States, and the opportunity to apply for travel authorization." Dkt. 1-11 at 2. *See also* 8 U.S.C. § 1254a; United States Citizenship and Immigration Services, *Temporary Protected Status*, https://www.uscis.gov/humanitarian/temporary-protected-status (last accessed 09/21/2026).

(Receipt Notice). The record is unclear whether Petitioner's re-registration application was approved, but it appears to have at least been extended past the April 2, 2025, expiration date because Officer Reed asserts USCIS terminated Petitioner's TPS status on November 20, 2025. Reed Decl., ¶ 8; Dkt. 5 at 3 n.1 (acknowledging "[t]he [G]overnment has terminated the TPS program for all Venezuelan nationals"). *See also Termination of the 2021 Designation of Venezuela for Temporary Protected Status*, 90 FR 43225-02 (Sept. 8, 2025).

Petitioner filed a separate application for relief from removal with USCIS on March 27, 2025. Reed Decl., ¶ 7. During her release, Petitioner was authorized to work in the United States—first through her parole, *see* Dkt. 1-10 at 2, and later as authorized by her pending relief application, *see id*. at 2.

In June 2026, Petitioner applied for employment at a company in Nome, Alaska. Dkt. 1, ¶ 15. As part of the application process, the company for which Petitioner applied arranged for her to fly from Anchorage to Nome on July 28, 2026, to visit and work in a local store. *Id.* ¶ 17.

Officer Reed asserts that on July 27, 2026, the "Pacific Response Enforcement Center"[3] notified "ICE Alaska" that Petitioner was scheduled to depart the Anchorage airport the following day. *Id.* ¶ 9. With that information, Alaska ICE conducted a records check and "discovered that Petitioner was present in the United States as a VHP" that had expired on November 20, 2024. *Id.* It is unclear from the record whether Alaska ICE agents were aware of Petitioner's subsequent TPS protections, her work and travel authorizations, or her pending asylum application.

---

[3] The Pacific Response Enforcement Center ("PERC") shares "timely and relevant ICE information with ERO field offices and law enforcement partners nationwide, issuing immigration detainers/request for notification on high-priority and high-risk criminal [noncitizens]. The primary users of the PERC are ERO and ICE field offices that benefit from real-time enforcement decisions and actions made by the PERC." *See* U.S. Immigration and Customs Enforcement, *Pacific Response Enforcement Center*, https://www.ice.gov/video/pacific-enforcement-response-center-perc (last accessed 09/21/2026).

On July 28, 2026, ICE arrested Petitioner at the Ted Sevens International Airport in Anchorage, Alaska and placed her into removal proceedings. Reed Decl., ¶ 10. Petitioner asserts that, prior to her arrest, she received neither advance notice that DHS intended to redetain her, nor a pre-deprivation hearing to "contest ICE's factual and legal premises." Dkt. 1, ¶ 38. Petitioner spent the night in an Alaskan jail before ICE escorted her on a flight to Washington the following day. *Id.* ¶ 29.

Once in Washington, Petitioner was transferred to the NWIPC on July 29, 2026, where she has since remained detained. *Id.* ¶¶ 11, 17. Petitioner is scheduled for an immigration merits hearing on September 22, 2026. *Id.* ¶ 15.

On August 17, 2026, Petitioner filed the instant petition. Dkt. 1.

## II. LEGAL STANDARDS

District courts may grant writs of habeas corpus "within their respective jurisdictions." 28 U.S.C. § 2241(a). This authority extends to challenges to immigration detention. *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001). A petitioner may obtain relief by showing that he is "in custody in violation of the Constitution or laws or treaties of the United States[.]" 28 U.S.C. § 2241(c). A petitioner bears the burden of proof by a preponderance of the evidence. *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

## III. DISCUSSION

Petitioner raises three claims. Her first two assert that Respondents violated the APA when they redetained her because they (1) failed to consider relevant evidence of her ties to the United States, (2) relied on incomplete records, and (3) failed to explain why her immediate detention, without notice or a hearing, was necessary. Dkt. 1, ¶¶ 121-31. That decision, according to Petitioner, was arbitrary, capricious, and an abuse of discretion. *Id.* ¶ 132.

Petitioner's second APA claim alleges that Respondents' noncompliance with applicable statutory and regulatory detention frameworks was not in accordance with the law and exceeded Respondents' statutory authority. *Id.* ¶¶ 133-44. Lastly, Petitioner asserts that her redetention without adequate notice or an opportunity to be heard, after having been released to live in the United States in 2022, violated her due process rights under the Fifth Amendment, when assessed under the framework articulated in *Mathews v. Eldrige*, 424 U.S. 319, 335 (1976). *Id.* ¶¶ 86-95.

Respondents contend Petitioner is lawfully, and mandatorily, detained under 8 U.S.C. § 1225(b)(2)(A) and that Due Process did not entitle Petitioner to pre-deprivation notice because the expiration of both her Venezuelan parole and TPS approval caused her to "revert back to the status she held at the time of her parole," which Respondents assert was an arriving [noncitizen] subject to mandatory detention. Dkt. 5 at 5.

**A. Statutory Detention Authority**

The thrust of Respondents' argument is that, because Petitioner was paroled into the United States in 2022 under 8 U.S.C. § 1182(d)(5)(A)—the only statutory mechanism permitting the release of an otherwise mandated § 1225(b) detainee—she remained an "arriving noncitizen" who was also "seeking admission" into the United States throughout her time paroled in the United States, as well as during her TPS status into 2025. *Id*. Upon her TPS termination, assert Respondents, Petitioner reverted to the status held at the time she was initially granted parole, which Respondents characterize as an arriving noncitizen. *Id.* Accordingly, Respondents contend Petitioner is mandatorily detained under § 1225(b)(2)(A).

As Respondents acknowledge, courts in this District have rejected similar arguments and found those similarly situated to be subject to the discretionary detention scheme under

§ 1226(a). *See id*. at 6 (and the Western District cases cited therein). Regardless, Petitioner is not challenging her detention under any purported statutory authority. She is challenging the lack of process provided at the time of her July 28, 2026, redetention as constitutionally deficient under the Fifth Amendment. Dkt. 1, ¶¶ 80-100. Separate from any purported statutory basis authorizing her detention, the Government remained "obligat[ed] to effectuate [Petitioner's] detention in a manner that comport[ed] with due process." *E.A. T.-B. v. Wamsley*, 795 F. Supp. 3d 1316, 1322 (W.D. Wash. 2025); *see also Zavorin v. Wamsley*, No. C26-0173-DGE, 2026 WL 309733, at *5 (W.D. Wash. Feb. 5, 2026). And "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews*, 424 U.S. at 333 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Accordingly, to the extent Respondents suggest § 1225(b) alone satisfies due process, the Court rejects that argument.

**B. *Mathews* and Due Process**

Due process rights extend "to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' . . . interests within the meaning of the Due Process Clause of the Fifth . . . Amendment." *Mathews*, 424 U.S. at 332. "Due process generally "requires some kind of a hearing *before* the State deprives a person of liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).

The *Mathews* test balances three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

Courts in this District apply the *Mathews* framework in cases challenging the lawfulness of a noncitizen's redetention. *See, e.g., E.A. T.-B.*, 795 F. Supp. 3d at 1321 n.4 (collecting cases). As noted, both parties apply the *Mathews* framework to Petitioner's redetention but reach opposite conclusions. *Compare* Dkt. 1, ¶¶ 105-08, *with* Dkt. 5 at 6-8.

1. *Petitioner had a liberty interest in remaining free.*

Respondents acknowledge that Petitioner possessed a liberty interest in continued release, *see* Dkt. 5 at 7, but suggest it was "reduced" because Petitioner's "parole expired approximately twenty months before her detention and her TPS status had been terminated approximately eight months before detention." *Id.* Respondents neither cite authority for this argument, nor articulate its implication.

When Petitioner was paroled in 2022, she took with her a liberty interest protected by the due process clause. *See Doe v. Becerra*, 787 F. Supp. 3d 1083, 1093 (E.D. Cal. 2025). That interest did not expire along with Petitioner's parole. *Ramirez Tesara v. Wamsley*, 800 F. Supp. 3d 1130, 1136 (W.D. Wash. 2025). The fact that she was granted TPS, authorized to work, and allowed to live in the United States for nearly two years after her parole expired only served to strengthen that interest. *See Gutierrez Navarro v. Noem*, 2026 WL 482686, at *5 (W.D. Wash. Feb. 20, 2026). The Court therefore finds that the first *Mathews* factor favors Petitioner.

2. *There was a high risk of erroneous deprivation.*

Respondents' argument regarding the second prong of *Mathews* is vague and inconsistent. First, Respondents contend the risk of erroneously depriving Petitioner's interest was low because the Government followed its own procedures in revoking Petitioner's parole. According to Respondents, Petitioner's parole automatically expired in November 2024, and

federal regulations did not require written notice. Dkt. 5 at 7 (citing 8 C.F.R. § 212.5(e)(1)). Respondents then emphasize that, "[e]ven though written notice was not required, [Petitioner] was notified of the expiration of her parole on April 1, 2025." *Id.* Finally, Respondents assert that "Petitioner is in active removal proceedings before an immigration judge." *Id.* The relevance of this facially conflicting information, and how it evidences a low risk of erroneous deprivation, is not immediately clear to the Court.

First, Respondents do not acknowledge, or explain, the legal significance of Petitioner remaining out of custody after her parole's November 2024 expiration, but it is undisputed Respondents did not seek Petitioner's return to custody or otherwise process her for removal proceedings when her parole expired. *See* 8 C.F.R. § 212.5(e)(1). Nor do Respondents acknowledge Petitioner's subsequent TPS approval, granted *after* her parole purportedly expired, which granted her protection from removal until November 2025. As for the written notice of Petitioner's parole terminating, the Court observes that notice was provided on April 1, 2025, *see* Dkt. 1-9 at 2, a date that fell within Petitioner's TPS protection. *See* Dkt. 1-11 at 2 (indicating TPS was valid from 12/20/2024 to 04/02/2025). Respondents do not explain why Petitioner was served with the notice of parole termination, which instructed Petitioner to "depart the United States now", *see* Dkt. 1-9 at 2, while she was protected from removal under her TPS approval.

If the written notice of termination was the operative document serving to revoke Petitioner's parole, such revocation also required a DHS official or designee to determine the purposes of parole had been accomplished or neither humanitarian reasons nor public benefit warranted Petitioner's continued presence. *See* 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5(e)(2)(i). Such evidence of that process occurring is not before the Court.

Revocation required "methods that comport with due process, such as a hearing in front of a neutral party to determine whether Petitioner's re-detainment is warranted." *Ramirez Tesara*, 800 F. Supp. 3d at 1136 (citing *Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023)); *see also Morrissey v. Brewer*, 408 U.S. 471, 482 (1972) ("By whatever name, the liberty [of parole] is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal."). Again, there is no evidence such process occurred here.

The following all appear undisputed: Before entering the United States, Petitioner applied for, and was granted, parole under the Venezuelan Parole Program; (2) Petitioner subsequently applied for, and was granted, TPS protection until November 2025; (3) Respondents allowed Petitioner to remain out of custody, despite parole purportedly terminating in November 2024 and her TPS ending in November 2025; (4) Petitioner has no criminal history and no history of violating conditions of parole; and (5) Respondents provided no pre-deprivation process before arresting her while she awaited her flight to Nome, Alaska on July 28, 2026. Petitioner appears to only have been arrested because "Alaska ICE discovered that Petitioner was present in the United States after her Venezuelan Humanitarian Parole expired on November 20, 2024." Dkt. 5 at 3; Reed Decl., ¶ 9.

Given the conflicting accounts of Petitioner's parole terminating, her continued release past both parole expiring and TPS terminating, the failure to follow revocation regulations, and the lack of any individualized pre-deprivation assessment of Petitioner's circumstances and whether detention was necessary, there was both a high risk of erroneous deprivation and value in additional safeguards. This factor weighs in favor of Petitioner.

//

3. *The Government's interest did not justify forgoing pre-deprivation process.*

Respondents assert an interest in "preventing [noncitizens] from remaining in the United States in violation of our law." Dkt. 5 at 8 (citation omitted). Respondents next assert that the Government has an interest "in protecting immigration proceedings from unnecessary delay, especially considering Congress's purpose for enacting [§] 1225(b)." *Id.* Respondents do not connect these purported interests to Petitioner's circumstances or otherwise explain how they were advanced by arresting and redetaining Petitioner without first providing any process.

The Government has an interest in enforcing immigration laws, ensuring noncitizens appear for proceedings, protecting the public, and prompt execution of removal orders, *see Demore v. Kim*, 538 U.S. 510, 518 (2003), but its interest in doing so without first providing pre-deprivation process was low. *See, e.g.*, *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019) ("If the government wishes to re-arrest Ortega at any point, it has the power to take steps toward doing so; but its interest in doing so without a hearing is low.").

Respondents do not articulate what law Petitioner purportedly violated by "remaining" in the United States. At most, Respondents acknowledge Petitioner continued living in the United States past her parole's expiration—a fact the Government certainly knew when it took no action after her parole expired, subsequently granted TPS protections, and authorized her to work until 2030. *See* Dkt. 1-10 at 3; Dkt. 1-11 at 2. As for Respondents' second articulated interest—preventing unnecessary delay in immigration proceedings—Respondents again fail to connect that interest to Petitioner's circumstances. The current record shows Petitioner was not in removal proceedings while living free in the United States. The first time she was placed in removal proceedings was several days *after* her redetention—nearly four years after she first

entered the United States. *See* Reed Decl., ¶ 12. A person cannot delay immigration proceedings that do not exist.

In the immigration context, the Supreme Court has recognized only two valid purposes for civil detention: to mitigate the risks of danger to the community and to prevent flight. *Zadvydas*, 533. U.S. at 690. Neither of these purposes appear served by Petitioner's detention, and certainly not implicated on the current record. Respondents offer no reason that Petitioner's redetention was so exigent that forgoing pre-deprivation process was arguably warranted. Under these circumstances, the Court cannot conclude that providing pre-deprivation process would have undermined any asserted governmental interest such that excusing pre-detention process was justified.

In sum, the *Mathews* factors favor Petitioner. Given the liberty interest at stake, the high risk of erroneous deprivation, and the governmental interest alleged, "providing effectively no pre-detention process to Petitioner[] here was constitutionally deficient." *Aucatoma v. Hernandez*, 2026 WL 1265541, at *8 (W.D. Wash. May 8, 2026); *see also Subham v. Noem*, 2026 WL 497101, at *4 (W.D. Wash. Feb. 23, 2026). Habeas relief, and specifically release from immigration custody, is the appropriate and constitutionally required remedy. *See Aucatoma*, 2026 WL 1265541, at *8 (and the cases cited therein).

**C. Remaining Claims and Injunctive Relief**

Having found habeas relief is warranted under *Mathews* and Due Process, the Court does not reach Petitioner's APA claims, as the requested relief is duplicative. Petitioner's first and second claims for relief are therefore DENIED as MOOT.

Petitioner seeks significant permanent injunctive relief. *See* Dkt. 1, ¶¶ 101-20. Her request reads, in full:

> Upon final judgment, permanently enjoin Respondents and all their officers, agents, employees, attorneys, and persons acting on their behalf or in concert with them as follows:
>
> a. Respondents SHALL maintain Ms. Atencio Suarez's release under conditions no more restrictive than those—if any—that actually governed her liberty immediately before July 28, 2026;
>
> b. Respondents SHALL NOT impose GPS or other electronic monitoring, or any new travel, geographic, curfew, or reporting restriction, unless and until they provide written notice identifying the factual and legal reasons for the proposed condition and a meaningful opportunity to challenge that condition before a neutral decisionmaker;
>
> c. Respondents SHALL NOT re-detain Ms. Atencio Suarez without proper advance written notice and a pre-detention hearing before a neutral decisionmaker unless permissible under an applicable statute or regulation;
>
> d. Respondents SHALL NOT treat Ms. Atencio Suarez's domestic air travel, presence at a domestic airport, or TSA, airline, reservation, passenger manifest, or other domestic-travel information as a violation of release, a material change in circumstances, or an independent basis to re-detain her, revoke or modify her release, or impose more restrictive conditions when relying on the same preexisting facts and immigration-status allegations reflected in Exhibits A through C;
>
> e. Nothing in the injunction shall prevent Respondents from acting upon genuinely new and particularized post-release conduct when immediate action is constitutionally permissible under an applicable statute or regulation; and
>
> f. Nothing in the injunction shall restrict ordinary airport security screening, adjudication of Ms. Atencio Suarez's immigration proceedings, detention following constitutionally adequate individualized process, or execution of an administratively final removal order after all notice and process required by applicable law[.]

Dkt. 1 at 39-40.

The overarching concern articulated by Petitioner is that TSA continues to share passenger identity information with ICE as part of their information-sharing agreement. *Id.* ¶ 156; *see* Dkt. 1-13. And because the employment she intends to seek if released requires

frequent air travel, she contends she runs the risk of future unlawful redetention anytime the TSA shares her information with ICE. Dkt. 1, ¶¶ 110-13.

Respondents offer what can only be described as a vague and cursory response; that Petitioner's threat of future harm is speculative and that the "substantially-redacted" information sharing agreement attached to Petitioner's petition does "not establish [she] will face detention every time she attempts to board a flight[.]"[4] Dkt. 5 at 2. Respondents do not identify the relevant redactions or otherwise articulate what it is about the redactions that fail to establish a future threat of detention. Notably, Respondents do not deny the existence of the TSA-ICE information-sharing agreement, its continuing operation, or that Petitioner's arrest and redetention was based on information shared between TSA and ICE. *See generally* Dkt. 5.

As Petitioner acknowledges, permanent injunctive relief requires her to "demonstrate: (1) that she has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006). Harm to the opposing party and weighing the public interest merge when the party sought to be enjoined is the Government. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, Petitioner has satisfied the *eBay* factors and demonstrated that she faces an individualized cognizable danger of future harm. *Cummings v. Connell*, 316 F.3d 886, 897 (9th Cir. 2003). Petitioner's redetention without first receiving any pre-deprivation process was an irreparable injury that cannot be compensated by typical remedies, such as monetary damages.

[4] The Cout presumes Respondents have access to an unredacted copy of the information-sharing agreement.

*Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *see Sosa v. Immigr. & Customs Enf't Field Off. Dir.*, C25-02722-JNW, 2026 WL 523274, at *4 (W.D. Wash. Feb. 25, 2026). The balance of hardships tips in Petitioner's favor—she runs the risk of unlawful deprivation of liberty while the Government has identified no interest undermined by pre-deprivation process. Finally, the public is served by requiring the Government to comply with the Constitution.

The record shows Petitioner was paroled into the United States in 2022. She was thereafter granted TPS protections, sought asylum, and was granted work authorization. There is no evidence she violated any conditions of parole or committed any criminal violations while living in the United States. Nor is there evidence that Petitioner poses a risk of flight or a danger to the community. Nevertheless, nearly four years after her release into the United States, Respondents arrested Petitioner without first providing any notice or opportunity to be heard, as if exigency required her immediate arrest. The Court's decision today reflects that it did not. Given the irreparable harm already suffered by Petitioner, and the continuing risk of future harm she faces from her individual circumstances discussed above, the Court finds permanent injunctive relief appropriate. Respondents are hereby ENJOINED from redetaining Petitioner without prior notice and a hearing that satisfies the Due Process Clause of the Fifth Amendment.

Finally, Petitioner seeks to enjoin the Government from subjecting her to GPS monitoring. Dkt. 1, ¶ 101, 106, 109. Respondents do not acknowledge or respond to Petitioner's request. *See generally* Dkt. 5. On the current record, however, there is no evidence Petitioner was previously unlawfully subjected to GPS monitoring, or that she runs the risk of again being placed on GPS monitoring. Her request is therefore DENIED without prejudice. Nothing from this Order prevents Petitioner from seeking relief again should she deem it necessary.

//

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS in part the petition, Dkt. 1, and ORDERS that Petitioner be released from immigration detention **within twenty-four (24) hours of this Order**, subject to reasonable conditions of release not to exceed those previously imposed on Petitioner. Respondents shall file a certification within forty-eight (48) hours that Petitioner has been released. Respondents are ENJOINED from redetaining Petitioner without prior notice and a hearing that satisfies the Due Process Clause of the Fifth Amendment.

Petitioner's claims arising under the APA are DENIED as MOOT. Petitioner's request for permanent injunctive relief related to GPS monitoring is DENIED without prejudice. Petitioner's request for an order compelling return of her personal effects and identification (Dkt. 1 at 39) is DENIED without prejudice as unbriefed.

Any fee petition shall be filed within the deadlines set by the Equal Access to Justice Act, 28 U.S.C. § 2412.

Dated this 21st day of September, 2026.

S. KATE VAUGHAN
United States Magistrate Judge